# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Barry D. Leiwant
*Interim Executive Director*
*and Attorney-in-Chief*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

January 22, 2024

**BY ECF AND EMAIL**
Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   **United States v. Joseph Garrison,**
**23 Cr. 597 (LAK)**

Dear Judge Kaplan:

Joseph ("Joe") Garrison is a bright but immature young man with a supportive family and tremendous potential. He was barely 18 at the time of his offense in this case—conspiring to commit computer intrusions—and recently turned 19 while on federal Pretrial supervision. He has matured tremendously during the last year and is continuing to mature and to progress on an upward trajectory.

Most importantly, Joe has gained an appreciation for the real-world consequences of his online conduct. At the time he was engaging in this offense, Joe was isolated and immersed in an internet subculture where hacking and fraud were normalized; he viewed his conduct as a kind of computer game. But now Joe sees his crime for what it is, stealing, and he is deeply ashamed and remorseful. See **Exhibit A** (Letter of Joe Garrison).

The advisory Guidelines range is 24–30 months, and the PSR recommends a downward variance to a year and a day. In light of Joe's youth and his mitigating personal characteristics, a further variance, to a noncustodial sentence, is appropriate. The parsimonious sentence in this case is a term of supervised release with a special condition requiring Joe to complete 200 hours of community service.

## BACKGROUND

### Joe Garrison's Personal History and Characteristics

Now 19 years old, Joe was born in the fall of 2004 in Madison, Wisconsin. His mother, Kimberly, was a teacher. His father, Thomas, was a network technician at a telecommunications company. Joe's older sibling, Indigo, rounded out the tight-knit family. His early childhood was positive and stable. He fondly remembers helping his mother cook family dinner and going out for Friday Night Fish Fry—a family tradition.

Joe was an active and social boy. His elementary school teachers remarked on his friendly, easygoing nature. Outside of school, he was a motivated Cub Scout and later a member of the Maker Space club. <u>See</u> **Exhibit B** at 1 (Letter of Kim Garrison). Joe also had an early interest in technology, a fascination that his father nurtured. When Joe's daycare reported that he would spend "playtime" creating structures out of the jumbo-sized building blocks, his parents got him his first Lego set, a Star Wars fighter. Afterwards, Joe and his father would often spend snowy winter days together in the basement, assembling elaborate Lego sets and building Hot Wheels racetracks. <u>See</u> **Exhibit C** at 1 (Letter of Tom Garrison).

Computers were easily accessible in the household, and Joe took to computers and especially computer games at an early age. "The first one he really latched onto was one called Minecraft." <u>Id.</u> at 2.[1] In Minecraft, which Joe played on the family's tablet, he found a digital blank canvas in which the only limitation on what he could build was his imagination. And he was not building alone. Because of Minecraft's emphasis on collaboration between players, there were endless numbers of servers, forums, chat rooms, and YouTube channels dedicated to the game. In these various communities, Joe discovered a dynamic social landscape in which he could meet fellow players, many of them his own age, and forge digital friendships by playing and discussing the game together.

At first, Minecraft simply slotted in as just one pastime among many. Joe still enjoyed school, Cub Scouts, and spending time with his friends and family.



---

[1] The best-selling video game of all time, Minecraft is especially popular with elementary and middle-school age children. In it, the player controls a character in a nearly infinite randomly generated world without any goals or objectives. Per the developers, "there is no wrong way to play Minecraft." https://www.minecraft.net/en-us/article/creative-vs-survival-mode.

██████████████████████████████████████████

In response, the Garrisons did everything they could to support Indigo the best way they knew how. As a result, they had less time for Joe. Of this turbulent period, Joe's mother writes:

> So, along with teaching full time and trying to nurture Indigo and Joe, a lot of my time was spent with the crisis that Indigo was facing. I mention this because Joe had always seemed generally fine and responsible, but he was often left to his own devices when I wasn't around. I fear that during this period of time, Joe got more and more into online gaming, and I wasn't really monitoring what he was doing. His excessive internet usage became normal for him.

Ex. B at 1. Indigo himself recalls:

> ████████████████████████████ I believe Joe felt like he couldn't talk about what was going on with me. While he has not said this explicitly, I am not blind. Looking back on that time of my life, I realize now that Joe was pushed off to the side because of my parents' concerns about me. I wish I had had the foresight to be a better sibling to him. I cannot change the past, but I can change the future. In this way, I will always provide love and support, much more than the past.

**Exhibit D** at 1 (Letter of Indigo Garrison).

Joe was used to having his parents' guidance and support in everything he did. Now, Joe he felt overlooked, even neglected. He started to become withdrawn from school, but he always did his school work. He did not act out, so his distracted parents did not notice that he was struggling with the lack of social support.

Instead, Joe turned increasingly to online gaming for validation and social connection. ████████████████████████████ Joe's parents were used to Joe's hours and hours of screentime and did not see anything wrong with it. Joe's parents' obliviousness to his maladaptive internet use became a defining feature of his adolescence.

By middle school, Joe had started gaming on the family computer in the basement. Switching from the tablet gave him access to more games, like Roblox and Fortnite, and made simultaneous internet browsing, instant messaging, and voice calls possible. Though Joe initially preferred playing games with his school friends, their parents were less permissive than his. So Joe increasingly played with any of the dozens of internet-only friends who always seemed to be logged on. New apps like Discord simplified voice calls and made it easy to pop between

previously siloed game discussion chat rooms, leading Joe to make more online connections.

Though Joe did not know his online friends' real names or what they looked like, he trusted them.  In fact, the anonymity of text and voice chat made it easier to open up to them than many of his friends from school.  Plus, his skill as a player made making new friends easy.  Joe was popular.  He spent hours in Discord calls that were like a revolving door of real life and internet friends.  When Joe's animated voice carried upstairs, Mrs. Garrison occasionally wondered who Joe was talking to all the time.  Looking back, she wishes she had paid closer attention, but Joe seemed happy, so his parents did not intervene.

By high school, some of Joe's closest internet friends were dabbling in the type of illicit conduct at issue in this case.  It made Joe uneasy at first.  After years of online gaming, Joe was no stranger to the darker sides of the internet.  Harassment, hate speech, doxing, account theft, and fraudulent third-party marketplaces are endemic problems in online games, perhaps even more so in those with predominantly adolescent playerbases, like Roblox.[2]  To Joe, scammers were an inextricable part of the online ecosystem.  He became impressed by his friends' stories of hijacking Fortnite accounts with rare, limited-edition content and intrigued by their reports that hacking was safe and easy to pull off with a program called OpenBullet.

## The Nature and Circumstances of this Offense

Ultimately, of course, Joe engaged in the offense conduct detailed in the PSR.  He mounted a credential-stuffing attack on a sports betting website, gained access to a large number accounts, and then sold the account credentials online, causing about $600,000 in direct losses plus additional legal and remediation costs for the website.

There is no excuse for his behavior, but the context is mitigating.  Joe's youth, his immaturity, his retreat into the internet, and his lack of supervision online all contributed to him being socialized into an online subculture that normalized and even glorified hacking.  Like the proverbial frog in slowly heating water, Joe did not perceive the increasing severity of his online activities.

Joe developed a proficiency with OpenBullet hacking in the same ways he had learned to play his favorite video games—by trawling through old forum posts, watching YouTube videos, asking more experienced community members for help, and plain trial and error.  OpenBullet was a puzzle to be solved, like Minecraft was when he first started gaming.  It was engaging and a way to fit in.

---

[2] For a concise explanation of the problems Roblox's in-game economy causes for children, see https://youtu.be/vTMF6xEiAaY?t=1181 (starting at around 19:41).

The pandemic and its associated school closures also played a part in this offense.  When Joe had his first day of virtual school, he had been dependent on the internet, to varying degrees, for more than half of his life.  But he was not the stereotypical ostracized and disaffected high-school nerd; he was well liked by his peers and had a core group of friends that he looked forward to eating lunch with every day.  His friends and school—the physical destination and the simple routine of getting out of bed to go there each morning—kept him grounded.  Until the pandemic, real life mattered to Joe. But the lockdown stripped away the positive support system he had created for himself.  Without that tether, he went further down the rabbit hole.  See **Exhibit E** at 2 (Letter of Chase Van Benschoten).

Joe returned to school after the pandemic only to be expelled because of the bomb-scare case detailed in PSR ¶ 54.  That case was symptomatic of Joe's acculturation into this toxic online community in which swatting was viewed as the digital equivalent of pulling the fire-alarm to get out of school.  But his arrest in that case only accelerated his descent because the immediate consequences—his expulsion from school, firing from his job at Walgreens,[3] and widespread news coverage of his case—all served to exacerbate the underlying problem.  The arrest should have triggered oversight and intervention.  Instead, Joe was released without any conditions of supervision.  His reaction was emblematic of immaturity and compulsive online gaming behavior.  Rather than appreciating the seriousness of the charges he faced, Joe fixated like the teenager he is on how his peers would react.  He found it even harder to engage with his real-world friends from school or work.  Alienated from his peers and forced to attend school virtually again, the Wisconsin case essentially recreated the pandemic conditions and drove Joe even further into the dark concerns of the internet where he found social acceptance and encouragement.

One measure of the seriousness of Joe's offense—the one that drives the guidelines—is the considerable amount of money that it involved.  But Joe wasn't really in it for the money.  He was living at home and working at Walgreens.  He didn't buy any expensive or flashy items in the real world; he spent money instead on rare in-game items, exclusive avatars, etc.[4]  The message Joe sent, "fraud is fun," PSR ¶ 12, is incriminating, of course, but also telling: to Joe, it was all one big online game.

---

[3] Joe began working at Walgreens, for minimum wage, in August 2021 and "was a model employee."  **Exhibit F** (Letter of Tim Kjol).  "He often picked up extra shifts and was Employee of the Month.  He stepped up to help train other employees," and covered a holiday shift for another employee who had a family emergency.  Id.

[4] Joe did not spend all the money.  He consented to the government's searching his crypto wallets to recover whatever it is possible to recover for forfeiture and restitution purposes.  (Joe lost access to these wallets when the FBI seized his devices.)

**Post-Offense Rehabilitation**

What finally broke the cycle of Joe's isolation and retreat into a criminal internet subculture was this federal case.  Joe's devices were seized by the FBI and he was required to fly across the country with his mother to turn himself in to face very adult, very real federal felony charges in New York.  His mother found the experience "surreal and terrifying."  Ex. B at 1.  To Joe, it was all too real.  "This experience has taught me how real everything was," he writes.  Ex. A at 1.

> When I got on the plane to New York City with my mom to surrender to the Marshals at the federal courthouse, that was real life.  When I was sitting in the cell for hours waiting to see the judge, that was real life.  I couldn't hide behind a screen.  Everything was suddenly very real and terrifying.  I know now how bad everything I did was and really wish I would have stopped before I kept going deeper and deeper.

Id.

Joe was released after presentment, but on strict bail conditions that, among other things, included Pretrial monitoring of his internet usage.  He has remained completely compliant.

In fact, Joe has thrived on Pretrial supervision.  Beyond mere compliance, he has used the time—and the relative break from the internet—to reconnect with his family, enroll full time in college at the Madison College, where he is in his second semester studying cybersecurity, take up cooking, and most importantly, reflect on his offense with the benefit of therapy.  His therapist, Dave Krych, has diagnosed him with Adjustment Disorder with Mixed Depression and Anxiety.  PSR ¶ 71.  Through therapy, "Garrison 'has shown an increased understanding of the serious impact of his actions and acceptance of the consequences."  Id. (quoting treatment records).

> Dr. Krych stated, 'In terms of a prognosis, I believe that Mr. Garrison has realized the real-world impact of his actions and sees that there are repercussions for others based on his virtual activities.  That is something that has been a significant awakening for him as he had been previously isolated in his online activities without a sense of the real world impact.  I do believe that the consequences of his actions and their far reaching nature will keep him from returning to his previous activities.'

Id.

That is surely correct.  Joe's maturation over the past year is obvious not only to his therapist, but also to his family members, who mention it in each of their letters.  See, Ex. B at 2 ("Joe has matured so much over the course of his case.  He is

a better son, brother, and person in general."); Ex. C at 2 ("He's matured so much since all this began."); Ex. D at 2 ("Since this case, Joe has also become much more emotionally mature.").

Joe's maturation is based not only his experiences but in his biology.  A growing body of research "has demonstrated that adolescence is a period of continued brain growth and change…The frontal lobes, homes to key components of the neural circuitry underlying "executive functions" such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life." *See* Johnson, et al., Adolescent Maturity and the Brain, J. Adolescent Health 2009;[5] Miller v. Alabama, 567 U.S. 460, 472 n5 (2012) ("It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance.") (quoting brief for Lawrence Aber et al. as amici curiae).

Joe puts it best himself, in his letter to the Court:

I deeply regret stealing people's money and login information.  At the time I was doing this, I couldn't fathom how upsetting it must have been for someone to learn that their account had been hacked and that the money in it was just gone.  I now understand now how wrong I was. Stealing is stealing.  It makes no difference that I did everything from behind a computer screen.  I didn't realize how much of an impact I was making on the world and how real my crimes were as I was doing them. Now I see that for every email and password and account balance on my screen there was a real human being who probably felt scared and confused and angry. I understand how many people were impacted by my selfish and immature decisions. I stole from them and even helped others do the same. That's why I want to take responsibility for the wrong I have done in every way I can, including by writing this letter. I am truly sorry.

Ex. A at 1.

## THE APPROPRIATE SENTENCE

"In deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."  United States v. Singh, 877 F.3d 107, 121 (2d Cir. 2017) (second internal quotation marks omitted).

---

[5] Available at the U.S. National Library of Medicine, National Institutes of Health, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678.

The PSR recognizes that a Guidelines sentence of 24–30 months would not be appropriate in this case, but its proposed sentence of 366 days is still greater than necessary.  In the totality of the circumstances, the parsimonious sentence is time served and supervised release with the special condition that Joe complete 200 hours of community service.

## The § 3553(a) factors support a noncustodial sentence.

The "nature and circumstances" of Joe's offense are mitigated by his personal "history and characteristics."  § 3553(a)(1).  Most salient is his youth.  Joe was about 18 years and one month old at the time of his offense.  He is still only 19 now.

The Supreme Court has time and again recognized "the mitigating qualities of youth" to be considered at sentencing.  Miller, 567 U.S. at 476.  In particular, the Court has noted that young persons have "diminished culpability and heightened capacity for change."  Id. at 479.

> [Y]outh is more than a chronological fact.  It is a time of immaturity, irresponsibility, impetuousness[,] and recklessness.  It is a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.  And its signature qualities are all transient.

Id. (internal quotation marks and citations omitted).  The Supreme Court noted that these conclusions rest "not only on common sense—on what 'any parent knows'—but on science and social science as well."  Id. at 471.

Although Miller was addressed to juveniles, its discussion applies equally to young adults.  The National Institute of Justice ("NIJ"), the research, development and evaluation agency of the U.S. Department of Justice, has conducted research on juvenile and young adult offenders and concluded that "young adult offenders ages 18–24 are more similar to juveniles than to adults with respect to their offending, maturation and life circumstances."  See NIJ, From Youth Justice Involvement to Young Adult Offending (2014), available at https://nij.ojp.gov/topics/articles/youth-justice-involvement-young-adult-offending.  NIJ recommendations included the establishment of "special courts for young offenders ages 18–24" and an "'immaturity discount' for young offenders that would involve a decrease in the severity of penalties, taking into account a young person's lower maturity and culpability."  Id.

Joe's youth merits special consideration because he embodies both the diminished culpability of a boy who fell into an internet subculture due to too little supervision and especially youth's heightened capacity for change.  Indeed, he has already changed with the help of his re-engaged family and his therapist, and he has put his life back on track.  He is in college, pursuing a degree in cybersecurity in the hope of turning his obvious skills to good use and to be able to pay back the harm he has done both literally and figuratively.

With respect to the purposes of sentencing, Joe has already been effectively punished and deterred. § 3553(a)(2)(A)–(B). This case represents his first conviction. A first felony conviction is itself a significant sanction carrying life-altering collateral consequences. See generally United States v. Nesbeth, 188 F. Supp.3d 179, 182 (E.D.N.Y. 2016) ("Today, the collateral consequences of a felony conviction form a new civil death. Convicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights."). Indeed, Joe has already had his first experience of the challenges felons face. He lost his job at Walgreens despite being a model employee, Ex. F, and then was flatly rejected for a job at Target on the basis of a background check. **Exhibit G** (Target Letter); see also Ex. A at 2. A noncustodial sentence is sufficient under these circumstances, especially given the "substantial restriction of freedom involved in a term of supervised release or probation." Gall v. United States, 552 U.S. 38, 48 (2007) (approving non-Guidelines probationary sentence).

The sentencing purposes of incapacitation and rehabilitation also do not suggest that it is necessary to remove Joe from the community. See § 3553(a)(2)(C)–(D). Joe has been compliant with Pretrial supervision and "is not viewed as . . . a danger to the community." PSR at 31. "[I]mprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Joe's rehabilitation will be best accomplished by permitting him to remain in college and to continue along the positive trajectory he has set himself.

**The economic-harm guideline deserves no deference.**

The only § 3553(a) factor that points toward imprisonment is the advisory Guidelines range of 24–30 months, based on a Criminal History Category of I and a total offense level of 17.

But the Guidelines' overwhelming focus on the loss amount in monetary offense cases often makes a Guidelines sentence greater than necessary in such cases. United States v. Algahaim, 842 F.3d 796, 800 (2d Cir. 2016); see also United States v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006), aff'd, 301 Fed. Appx. 93 (2d Cir. 2008). In fact, the Second Circuit has specifically invited District Courts to consider non-Guidelines sentences in economic-harm cases for this reason. See Algahaim, 842 F.3d at 800 (where the "Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence"); see also, e.g., United States v. Gupta, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) (describing how the Guideline effectively ignore everything but the loss amount and that many of the resulting Guidelines-recommended sentences are "irrational on their face"); United States v. Ovid, 09 Cr. 216 (JG), 2010 WL 3940724, at *1 (E.D.N.Y. Oct. 1, 2010) (criticizing § 2B1.1).

More generally, the history of §2B1.1 shows the loss guideline to lack any sound policy rationale. It was not based on empirical research concerning deterrent efficacy or any other variable relevant to the purposes of sentencing. It was not even originally intended as a codification of past sentencing practices. To the contrary, it was written with the goal of increasing the severity of sentences over historic levels. See United States v. Corsey, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring). ("The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. As such, district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides.").

In light of the criticism surrounding the loss guideline, it is not surprising that statistics provided by the Sentencing Commission find that courts most often give below-Guidelines sentences in fraud, theft, and embezzlement cases. Judges in this District imposed Guidelines sentences in just 18.3% of such cases in fiscal year 2022. See U.S. Sentencing Commission Statistical Information Packet for Fiscal Year 2022, Southern District of New York at Table 10.[6]

**Community services is an especially appropriate sanction.**

Finally, community service is an especially appropriate sanction in this case. Imprisonment would derail Joe's education and mental health progress. Home confinement would allow those processes to continue but would recreate some of the social isolation that precipitated Joe's offense conduct. By contrast, a community service requirement will allow Joe to begin making a kind of restitution immediately, even before he is able to obtain a remunerative job, and will have him out in the community interacting with people. Community service would therefore be not only a sanction (unpaid labor) but also means of encouraging Joe's rehabilitation.

### CONCLUSION

"What I am trying to say is that [Joe] realizes he messed up in a big way. He got in over his head and will be paying the consequences the rest of his life." Ex. C at 2. The decisions that Joe made at age 18 have altered the course of his life, and this conviction will always follow him. It is not necessary to impose imprisonment as an additional punishment on him now. The Court should instead impose a

---

[6] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/nys22.pdf.

sentence of time served and supervised release with a special condition of 200 hours of community service.

Sincerely,
/s/
_____
Clay H. Kaminsky
Assistant Federal Defender
(212) 417-8749
(646) 842-2622
clay_kaminsky@fd.org

CC:   AUSAs Kevin Mead and Micah Fergenson

# EXHIBIT A

Honorable Lewis A. Kaplan
United States District Judge
500 Pearl Street
New York, NY 10007

Dear Judge Kaplan,

      I am extremely sorry. I would like to apologize for all my actions and everything I've done. I deeply regret stealing people's money and login information. At the time I was doing this, I couldn't fathom how upsetting it must have been for someone to learn that their account had been hacked and that the money in it was just gone. I now understand now how wrong I was. Stealing is stealing. It makes no difference that I did everything from behind a computer screen. I didn't realize how much of an impact I was making on the world and how real my crimes were as I was doing them. Now I see that for every email and password and account balance on my screen there was a real human being who probably felt scared and confused and angry. I understand how many people were impacted by my selfish and immature decisions. I stole from them and even helped others do the same. That's why I want to take responsibility for the wrong I have done in every way I can, including by writing this letter. I am truly sorry.

      If I met someone whose money I stole, I would be speechless. Just thinking about facing someone who lost money because of me has made me realize how serious my actions were. I think part of me always knew that the lies I told myself when I was doing this wouldn't hold up if I said them out loud. Someone whose money I stole wouldn't care about my excuses. They would just want their money back. I didn't realize how lost I was in the world of internet scams. For example, if you asked me before my arrest how I would have reacted if someone stole my family's money, I obviously would have said that I would be upset. But I could have said that in one minute and then gone and done this in the next minute, because I couldn't admit to myself that I knew what I was doing was wrong.

      This experience has taught me how real everything was. When I got on the plane to New York City with my mom to surrender to the Marshals at the federal courthouse, that was real life. When I was sitting in the cell for hours waiting to see the judge, that was real life. I couldn't hide behind a screen. Everything was suddenly very real and terrifying. I know now how bad everything I did was and really wish I would have stopped before I kept going deeper and deeper.

      This case has completely changed my life and my mental health. I have been seeing a therapist for some time now and he has helped me greatly, he has helped me with not only calming down and realizing that my life isn't over but helped me realize how much good I can do in the world. He has helped me see that I am still only 19 and have my whole life in front of me. When I was thinking about what I might want to do with my future, I decided that I would love to work to prevent people from doing what I did to end up in this situation. I want to defend innocent people and companies from hacking and help the world instead of doing crime.

      Last fall I enrolled in community college to continue my education and I'm focusing on studying cybersecurity. My goal someday is to use my knowledge about computers to earn money in a legitimate way instead of stealing it. I want to work hard and pay back all the money I owe for committing this crime. I know it won't be easy and that sometimes there will be

obstacles in my path because of my felony conviction. But I promise I will work hard to overcome these challenges. No matter if I succeed or fail, the most important thing is that I will never break the law again.

There was another moment last summer where I realized how badly I messed up. I had applied for a job at Target so I could earn some money and get out of the house more. I knew I would enjoy it because I worked at Walgreens when I was in high school and really liked my job. I went through the whole hiring process and was set to start the next week after they finished the background check. I didn't get the job. When they sent me the results, it was pages and pages of my face, my name, my pending charges, and all the news articles and headlines about what I did. I realized in that moment that the terrible choices I made as an 18-year-old would follow me for the rest of my life. It was terrifying. At first, I felt like it was unfair, because it all had nothing to do with my work at Target. Then I realized that I only have myself to blame, and that I have to get used to people making judgments about the type of person I am before they know me. I will need to prove with my actions that I have grown and that I am not that person anymore.

I have become a lot more mature because of this case and really hope Your Honor can see that as well. I have learned so much from this whole experience and will never forget these lessons so that when this case is over, I can come out of it with fresh eyes and do good. I would love to be able to follow in my brother Indigo's footsteps. He went through a lot of adversity growing up that I didn't know much about at the time, but since learning more about it I have realized how big an achievement it is that he overcame his challenges by going to community college for two years and then transferring to UW-Madison. Now he's going to graduate from a great college with a degree in education to become a teacher like my mom. Indigo has shown me that I can put my past behind me and still have a chance for a great career and future.

I truly believe I can right my wrongs and get past all of this. Hard work doesn't scare me. I know I can work a real job and enjoy it. I worked at Walgreens even while all of this was going on, and I took a lot of pride in my work there and enjoyed it. I was friends with my co-workers, and I liked having the responsibility of getting all my work done. Seeing a clean bathroom or a tidy shelf made me feel like I was doing a good job and made me want to keep working there.

Part of taking responsibility has been learning that my actions didn't just affect the people whose money I stole or helped others to steal. My behavior has also harmed my family in ways I never considered when I was committing this crime. It has uprooted our entire lives, and it's my fault. My mom had to retire early after being a teacher for her entire life. My face and last name have been all over the news. Everyone in Madison heard about what I did, and everyone who knows my family knows about my selfish decisions. I am so sorry to my family for all the stress I have caused them and wish more than anything that I could undo what I did. But since I can't, I know the only thing I can do is take responsibility, apologize, and promise that I won't ever put them through something like this again.

Your Honor, I am sorry for the harm I have caused. I hope you can give me another chance. I accept whatever you decision you make, and I thank you for reading my letter.

Sincerely,
Joe Garrison

# EXHIBIT B

January 9, 2024

Honorable Lewis A. Kaplan
United States District Judge
500 Pearl Street
New York, NY 10007

Dear Judge Kaplan,

My name is Kim Garrison, and I am Joe Garrison's mother. I recently retired from teaching after a total of 32 years, with the last 25 of those years in Madison, Wisconsin. I'm writing this letter in support of Joe and to help you know him as I know him.

"Still waters run deep" is a good way to describe Joe. At times, he is quiet and reflective. He is also bright, capable, and caring. Throughout his elementary school years, he responded well to teachers who were able to let him be more of a "hands on" learner. He loved first grade and reading Mo Willems books. He was in Cub Scouts and loved all the activities and friends he had, earning badges for shooting arrows or camping.

When he was in about 4th grade, ██████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████. This change in our family life was totally new to all of us, and due to my husband's work hours, I was the parent who took care of most of the new stuff. So, along with teaching full time and trying to nurture Indigo and Joe, a lot of my time was spent with the crisis that Indigo was facing. I mention this because Joe had always seemed generally fine and responsible, but he was often left to his own devices when I wasn't around. I fear that during this period of time, Joe got more and more into online gaming, and I wasn't really monitoring what he was doing. His excessive internet usage became normal for him.

During upper elementary and in middle school, he slowly became more withdrawn as far as school; he did what he needed to do and turned in his work, but he didn't get excited about his classes or activities. His teachers reported that he was an affable kid who participated when needed, but he didn't center his life around school. However, there were some things at school that still interested him. For example, in middle school, there was a club called Maker Space that he loved and talked about at home. One of his teachers provided a safe place, tools, and materials to build stuff with his own hands. Joe was very creative. He loved the environment of Maker Space, the teacher, and his friends that were in the club. At home at these ages, he would play computer games in his room or on the computer we had in the basement. He wasn't really interested in playing sports or immersing himself in school, so we let him be on the electronics. He also went on bike rides and did things with his friends, but he loved technology the most.

To me and Joe's father, Joe's internet usage seemed harmless. That's why I was stupefied and shocked when I learned of the charges he is facing. I now understand what he did, and I agree that it was inexcusable. But Joe is my son and I love him, so no matter what he has my support. When I first heard about the case and the charges, it seemed like a TV show. The FBI pounded on our front door, raided our house for two hours, and took many different electronics. I had to go with Joe to New York to turn himself in to the US Marshals. While Joe was processed, I spent time in a Starbucks and with his lawyer. Then I sat in federal court and watched as the judge listed off the felony charges that my son was facing. It was all surreal and terrifying.

I had to retire from the Madison Metropolitan School District a couple years earlier than I planned because the news was everywhere; Joe attended the high school I where I had taught for 11 years. I was totally off center, meaning that outwardly I was still substitute teaching and following up with teachers and students in a professional manner, but inside I was rocked to my core. Never in my life did I think something like this would happen to our family.

I worry about Joe's future and what he will be able to do or not do with a federal felony conviction. I worry about whether he will be able to find a job to support himself. I worry about people judging him for the rest of his life based on foolish mistakes he made as a naive and immature 18-year-old. I do have hope that Joe will overcome the challenges. He is a kind, smart kid. But as his mother, I of course worry about these things. Since all of this happened, Joe and I have had many conversations about his case, and he is deeply sorry for what he did. He wants to fix what he can and take responsibility. Joe knows what he did was wrong.

Joe has matured so much over the course of this case. He is a better son, brother, and person in general. He has recently been enjoying cooking for the family. For his 19th birthday in October, we got him an air fryer which he has used almost daily, and for Christmas we got him a bread machine which he has already used to make a variety of kinds of bread. By trying new recipes, he has learned how to cook a bit and built his confidence. Cooking and trying new recipes is like the Maker Space Club—his creativity shows. Joe has been taking classes in cyber security at Madison College and he is now entering his second semester. He enjoys what he is learning. He wants to contribute to others not making the same mistakes he did. He has become more talkative since his middle and high school years, especially since he finished his senior year online and has been home full time since graduating high school. We have all been able to spend more time together.

Joe knows he can only blame himself for the trouble he is in, and he feels great remorse for his bad choices and how it has affected our family. He has expressed to me many times that he wishes he hadn't done what he did; he knows we have all been under tremendous stress dealing with these charges and has apologized to us multiple times while trying to be a better son. He has been attending therapy every 2 weeks for quite some time and I know that this has helped him to process what he did. He gets bad stomach aches now and then, and I know it's a result of stress. Joe and I have had trouble sleeping many nights because we are thinking about this situation.

Because I retired earlier than planned, our family now has to worry about money in a way that we didn't before. My husband is still working full time, which is good, but at this point in our lives we didn't think that we'd have to worry about money the way we are. The trips to New York for assorted court proceedings are stressful in themselves, but with money worries added on, it becomes very difficult. I had only been to New York a couple times before to see some shows on Broadway; Joe had never been. It is a daunting place to be for a stressful reason.

Joe plans to continue his education in cyber security and would love to be earning money with a part time job while making positive changes to move forward. He applied to Target for a job but didn't even hear back after the background check. Taking responsibility and making amends for his actions will help Joe to grow into the person I know he can be. He has been living at home with us so far through this, and that support will continue. His family will be with him for his entire journey. Thank you for your time in reading this letter, and I hope this helps you to understand a little about Joe, how this all happened, that Joe takes responsibility for what he did, and that he won't make choices like this again.

Sincerely,
Kim Garrison

# EXHIBIT C

January 10, 2024

Honorable Lewis A. Kaplan
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Kaplan,

My name is Tom Garrison. I am Joe Garrison's father. For the last 11 years, I have worked for a telecommunications company. I will explain a bit about Joe growing up and where I think his interest in technology came from. However, I would like to first explain how we arrived at his name as it deals with my hopes and aspirations for him and his life.

Joe is named after my oldest brother, Joseph Hamilton Garrison. We grew up in a rural area of Southern Illinois. My brother was very successful academically and surprised everyone in our town of about 5000 people by getting accepted and attending the Massachusetts Institute of Technology. After graduating, he joined the US Air Force. In December of 1973, a week after his 27th birthday and about a week before he was due to be shipped over to Southeast Asia, the small plane he had rented crashed killing he and a friend.

My brother never married or had children. I resolved at an early age that if I ever had a son, I wanted to name him after my brother in order to honor him and keep his memory alive. I was thrilled when my son Joe was born and my wife agreed that Joseph Hamilton Garrison was too good a name to let die with my brother. My wife and I promised to provide Joe with the upbringing and environment that would allow him to accomplish great things in his own life.

Growing up, Joe and I were close. My nickname for him was Lil' Buddy. We spent many hours in the backyard doing Whiffle Ball and flying kites. Inside during the long Wisconsin winters, we played with Legos and Hot Wheels. One activity we particularly enjoyed was the annual weekend camping trip with his Cub Scout pack. We did that several years in a row. (Our enjoyment of the weekend increased after the first year when we learned to bring along an air mattress!) He was very happy to be with the other boys learning the various Cub Scout skills, having massive kickball games, and doing a big campfire at the end.

The other activity that he and I thoroughly enjoyed over the years was bowling. I had bowled in a junior league growing up, so when I saw the local bowling alley had a parent-child league, I asked Joe, who was around 7 at the time, if he wanted to do it with me. He said sure.
We had a great time in the league. The kids ranged in age from really little, I distinctly remember one still wearing pullups, to 18. It was great fun and Joe started to get really good at it. It wasn't too long before we both had bought our own shoes and bowling balls. We even won the league a couple of times over the years.

I would also add that a few months ago when we went to the alley to bowl one Sunday night, he beat my all-time high score with a 257! It was amazing. It's a shame that we can't continue to bowl together, but my work hours preclude one of the adult leagues and Joe was a little gun shy about bowling with adults.

Now I would like to get into Joe's proclivity with technology. I believe I had something to do with that. It wasn't that I taught him anything, but I probably provided the environment for it, more so than my wife. I bought my first personal computer, with a generous gift from my parents, in 1986. It was an Apple Mac Plus. I have had a computer or computers ever since.

Both my kids took to computers at an early age. Joe started with various kids' games. The first one he really latched onto was one called Minecraft. I knew what Minecraft was, but really had no interest in playing it. From there Joe started doing other games such as Fortnite and Roblox. I must say it was around then that I lost track of what he was doing on the computer and the internet all the time. Joe didn't say or do anything that would have made my wife and I concerned about what he was up to online. Even if in hindsight, he was spending more and more of his time in his room online, we figured Joe was being his usual quiet, laid-back self.

At some point, Joe began to teach himself programming with YouTube videos. He would tell me about some program he had written, and it was beyond me. He started hanging out in chat rooms, and he had friends around the world that he communicated with and traded programming tips. Looking back, it was probably at this point I should have paid more attention to what he was doing, but in all honesty, I thought we had raised him right and trusted him to do the right thing.

I make no excuses for what Joe did. I believe it was a case of a young kid getting involved online with the wrong people, but he should have known better than to get involved in illegal behavior. Since this all came out, he has deleted all his accounts used to communicate with others on Discord. He has been complying with the pre-trial requirements. Instead of being in his bedroom on a computer he has been helping us around the house. He has developed quite an interest in cooking. His big gift at Christmas was an air fryer!

Joe is taking things seriously. He's been seeing his therapist, Dave Krych, every two weeks for a while now, and he really likes the guy (as do I). It seems like Joe coming out of his shell in the last year has a lot to do with his sessions with Mr. Krych. He has also been taking classes at the local community college and finally got his driver's license (Unlike his older sibling, he hasn't totaled one of our cars yet). What I am trying to say is that he realizes he messed up in a big way. He got in over his head and will be paying the consequences the rest of his life. What keeps me up at night is trying to see how he will move past this. I keep thinking about how the trajectory of his life has been irrevocably changed from actions he chose as an 18-year-old.

Joe is a really sharp and sweet kid, and I know he has the potential to accomplish great things in his life (even if he won't be going to MIT or joining the Air Force). Joe lost his way for a while, but I believe that he understands the harm he's caused and has grown from this experience. Joe has the structure and support that he needs to put his brains to good use. He's matured so much since this all began. Joe has the unconditional love of both his mother and me, right now and forever, and we intend to keep helping him on his way toward an independent and rewarding life.

Thank you for your time,

Tom Garrison

# EXHIBIT D

Honorable Lewis A. Kaplan
United States District Judge
500 Pearl Street
New York, NY 10007

Dear Judge Kaplan,

My name is Indigo Garrison, and I am Joe's older sibling, 21 years old at the time of this writing. I am currently a student at the University of Wisconsin-Madison majoring in elementary education; I hope to teach kindergarten or first grade in the future. I am writing this letter to paint a picture of the kind of person Joe is and show why his family and friends will always love and support him.

Joe is my younger brother, the baby of the family. Growing up, Joe and I always had a typical sibling relationship: love, interwoven with inconsequential arguments, like who got to pick what TV show we were going to watch or who got to use the iPad.  During our childhood, he always wanted to be doing something with his hands. He loved the intricacies of survival; he was a Cub Scout for a few years, which introduced him to camping and 'surviving' away from modern conveniences. As a child, he put together first aid kits with our father, which were then put in our family's cars. One of them is still used today. Joe putting the first aid kits together is an example of his love for his family. Should the need have ever arisen, he wanted us to be taken care of. The same can be said for now. Joe and my mother have been cooking together, mostly meals with chicken. Our parents also gifted him a bread maker for Christmas, and he also has an air fryer that he uses to cook up food for me. He enjoys testing recipes and seeing which are good or bad. While I am a picky eater, his food has made for good dinners for my family.

Even though Joe has always been pretty easygoing, his late childhood and adolescence have not been without strife. He kind of did his own thing and spent most of his time in his room online. I sort of understand how Joe got lost in that world because as a pre-teen and teenager I became dependent on online activities too. I didn't feel like my family or kids at school really understood what I was going through, so I found solace in online friends who seemed to get me as a person. Unfortunately, I also met people who hurt me more than they helped.

I believe Joe felt like he couldn't talk about what was going on with him. While he has not said this explicitly, I am not blind. Looking back on that time of my life, I realize now that Joe was pushed off to the side because of my parents' concerns about me. I wish I had had the foresight to be a better sibling to him. I cannot change the past, but I can change the future. In this way, I will always provide love and support, much more than the past.

Joe's actions in this case have unleashed a lot of stress our family. When the FBI raided our house, I had a panic attack. My mother was also forced to retire early because she could not handle the stress that came with teaching high school students and the stress that came with Joe's case. In turn, my parents have had to worry about money more than they did in the past.

However, despite these negatives, there are an array of positives as well. Joe has been attending Madison College, majoring in cyber security. He told me he wants to prevent others from making the same mistakes he did. I also attended Madison College, though as a Liberal Arts transfer student. I have since transferred to the University of Wisconsin-Madison. I am majoring in elementary education; I hope to teach kindergarten or first grade in the future. I believe Joe has the smarts and the dedication to follow my same path and one day graduate with a bachelor's degree from UW-Madison or another UW school. Joe has a strong work ethic when he sets his mind to something. For example, Joe worked at Walgreens when he was in high school, where I also work, and was a dutiful and resourceful employee. He enjoyed helping customers and liked his co-workers.

Since this case, Joe has also become much more emotionally mature. My brother has been attending therapy every two weeks; he really likes his therapist and has made great progress in coming to terms with his actions and being more in touch with his emotions and thoughts. Now that he isn't spending all day on the computer, he's gotten closer to the whole family. Joe and my mother have been spending time together at home watching TV shows in the evenings, and Joe and my father go on walks around our neighborhood or on hikes on nature trails around the county. Joe's actions were regrettable, but he has worked incredibly hard to rectify his mistakes. In the future, he wants to continue his education, and keep cooking and being around our family. We have always supported him and will continue to do so in the future.

I hope this letter helps understand the kind of person Joe is and has worked to be since his arrest. I also hope that you consider leniency when you make your decision. Thank you for your time.

Sincerely,
Indigo Garrison

# EXHIBIT E

January 10, 2024

Honorable Lewis A. Kaplan
United States District Judge
500 Pearl Street
New York, NY 10007

Dear Judge Lewis A. Kaplan,

My name is Chase Van Benschoten, and I am a friend of Joe Garrison. I have known Joe since second grade and hung out with him all the time until my senior year (because he wasn't attending school in person). From when we were 7 or 8 years old, we spent time together at school and usually spent time together out of school about once a week. I currently attend Madison College. My plan is to transfer to the University of Wisconsin at Madison to study music, specifically piano.

After learning about what Joe did, I did not hate him for it since he did not directly harm me, but I cannot deny his actions were very immature and stupid. Despite this, I still consider him a friend, even though many of the people he was friends with do not consider him one anymore. Admittedly, I did not talk to him much after the incident because I wanted to keep a neutral stance to not bring negative attention to myself in school, as other teenagers are ruthless in 'exposing' and defaming people who associate with wrongdoers. I wished I could more, because I knew he had nobody else to truly connect with except for his family. However, because I am no longer in high school, I am not as worried about how it will look if I spend time with him.

Speaking of friends, I used to hang out with Joe and our other friend (who I will not name because he has since broken all ties with Joe) as kids and young teenagers. I can say for sure that Joe was never mean as a kid or someone who was full of malicious intent as one would expect for someone with his charges. In fact, he usually was always relaxed and amicable to be around. We used to go watch new movies that came out, attended each other's birthdays every year, and just him and I would go to a golf driving range or a course and play a round together. We also used to go to a swim academy during its open swim days too.

Speaking of swim academy, I remember one event when we were about 11 or 12 that shows Joe's character as a selfless person and good friend. Me, Joe, and the other friend were hanging out at the swim academy one day. At the academy there were table-like structures in the pool made of PVC piping and plastic sheets, primarily used to assist children in learning to swim. This time one of them happened to be in the open swimming area by chance. Being kids still, we decided to use it to play some swimming game we were playing (which involved something like seeing who could stay under the water the longest while holding onto the structure). Obviously after a few times one of us decided to go underneath the sheet part which primarily you would stand on to stay under the water longer. This turned out to be a terrible idea, as the other friend tried this and got his foot stuck under the PVC pipe. Our friend was trapped underwater and unable to get to the surface, but I remember Joe going down to rescue our friend, who was about to drown. Keep in mind we were not muscular at all, and this swimming structure was very heavy as the water resistance made it much harder to move around. I remember him going down for around 20 seconds before pulling my other friend up with him. I believe it is an example that Joe truly cared for his friends and risked his own life to save someone.

While I agree that Joe's actions were terrible, I believe he got caught up with bad people who affected him and his decisions during high school. I'm sure you remember the beginning of the pandemic in 2020, which forced everyone to stay inside and unable to properly socialize. Many people struggled mentally and emotionally as their only regular way to see friends and external family was through a screen on their phone or computer. I'm sure this was the same for Joe as well. While the situation was slightly better in 2021 (As I went golfing with Joe a few times in the spring of that year and hung out a few times), I believe he was beginning to be influenced then by bad people online.

I personally know Joe has always been good at computer related things, such as programming and analytical challenges. This is where I think things got to his head. I was surprised when Joe and I went back to in-person school for our Junior year and Joe had to retake geometry, which you would normally pass as a sophomore. I think during the pandemic Joe stopped caring about school, and I expect that this is when he was spiraling out of control and getting in over his head. I remember Joe saying once that he never went to the remote classes, he would just try to do the homework without attending the material. For myself during the pandemic I struggled in history class because I wasn't in a classroom and no one could force me to read the textbook like I needed to.

Despite him not being as focused, Joe was still working a part-time job at Walgreens, which was respectable for a high school student. We often talked about what we did at each other's jobs, and we talked together about our plans to go to Madison College the next year. This was why I was so saddened and shocked when I learned about what Joe did because I never thought my friend, I had known for so long could get himself into trouble this big. I do feel for Joe because after what happened it was like no one at school wanted to be associated with him anymore and I know that must have been hard.

Although I have not spoken with him much since this case, I hear that Joe is doing good things. I learned that he recently got his driver's license too in order to drive himself to college. I know he was still looking for a new job. Personally, I think Joe thought of his hacking as a hobby of sorts, not realizing the consequences of what he was doing, because he has shown that he is still trying to pursue his goals despite everything. Although Joe took a different route than he planned, sure enough now we are both studying at Madison College and planning to get our bachelor's degrees in the future.

While I do know Joe is responsible for his actions, I know he regrets what he did enough. I truly believe if he gets a lenient sentence, it will help him as he is on a positive track now. I also worry about his mental and emotional health if he was to go to prison as a teenager. As a longtime friend who wishes to see Joe Garrison have a chance of a normal life, I truly hope you give a fair sentence of proper accord in response to this letter or any other you may read.

Thank you,
Chase Van Benschoten.

# EXHIBIT F

Dear Judge Lewis A. Kaplan:

My name is Tim Kjol and I am a store manager for Walgreens. I have been employed with Walgreens for 22 years. Due to my employment with Walgreens, I have known Joe and his family for over 15 years.

I hired Joe when he was in high school and he worked for me for 1.5 years. During his employment with me, he was a model employee. He often picked up extra shifts and was Employee of the Month. He stepped up to help train other employees.

Joe was generous with his time. He picked up a holiday shift for someone that had a family emergency even though he had his own family celebration.

During the initial investigation, Joe still fulfilled his Walgreen's obligations. He remained positive and still helped his fellow employees by taking extra shifts and continued to train new employees.

When Joe came to inform me of the situation, he was very remorseful and felt sorry to be impacting people negatively by his actions.

Currently he is attending Madison College and wants people to learn from his mistakes. He wants to learn from the experience and his mistakes. I feel he is remorseful and will be a good steward of society going forward.

Sincerely,

Tim Kjol

# EXHIBIT G

July 14, 2023

Joseph Garrison
██████████████
Madison, WI ████████████

Dear Joseph Garrison,

Thank you for your time and interest in Target.  As you know, we recently obtained a consumer report (also known as an investigative consumer report in California) and other information related to your criminal background.  We also provided you with a copy of that consumer report and the other information Target located, and notified you if the information was correct, you may be ineligible for employment with Target.  We then provided you information on how to dispute the contents of the consumer report.

Unfortunately, we will not be able to offer you employment at this time.  Our decision was based in whole or in part on information contained in your consumer report (also known as an investigative consumer report in California) and/or other report received from Accurate Background, as well as the other information Target located relating to your criminal history.  Accurate Background did not make the decision regarding your employment and cannot provide you with specific reasons as to why your employment was denied.

You have rights under certain federal and state laws.  You have the right to request an additional free copy of the consumer report (also known as an investigative consumer report in California) and/or other report if you request the report from Accurate Background within 60 days of your receipt of this email message.  You also have the right to dispute and correct any error in this report by directly contacting Accurate Background at (844) 220-6741 to open a dispute.  You may also send an email to consumer@accurate.com with the following information:

- First and Last Name
- Contact Information (telephone number, email address)
- Nature of Dispute (criminal, education, etc.)

Accurate Background, LLC
7515 Irvine Center Dr.
Irvine, CA 92618
(844) 220-6741
https://www.accurate.com/file-a-dispute-accurateace/

In addition, if you believe this decision is in error and you would like Target to reconsider it based on additional information about the facts and circumstances of the offense(s), your employment history, rehabilitation or good conduct, or any other information, email that information to employment.screening@target.com within 5 business days from the date of this message.  Please include your full legal name and the words "Request to Reconsider" in the subject line of your email.

If you have already resolved this issue with Target or Accurate Background, please disregard this email message.

Sincerely,

Target